# Illinois Official Reports

## Appellate Court

---

### *Williams v. BNSF Ry. Co.*, 2015 IL App (1st) 121901-B

---

| | |
|---|---|
| Appellate Court Caption | ANTHONY WILLIAMS, Plaintiff-Appellee, v. BNSF RAILWAY COMPANY, f/k/a Burlington Northern Railway Company, f/k/a The Burlington Northern and Santa Fe Railway Company, d/b/a The Burlington Northern Santa Fe Railway Company, Defendant-Appellant and Third-Party Plaintiff-Appellant (Quality Terminal Services, LLC, Third-Party Defendant-Appellee). |
| District & No. | First District, Third Division<br>Docket No. 1-12-1901 |
| Filed | March 18, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-L-8509; the Hon. Clare E. McWilliams, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Daley Mohan Groble PC, of Chicago (Raymond H. Groble III, Sean M. Sullivan, and Jeffrey J. Scolaro, of counsel), for appellant.<br><br>Cochran, Cherry, Givens, Smith & Montgomery, LLC, of Chicago (James D. Montgomery, Jr., and John K. Kennedy, of counsel), for appellee Anthony Williams.<br><br>Fletcher & Sippel LLC, of Chicago (James A. Fletcher and Peter C. McLeod, of counsel), for appellee Quality Terminal Services, LLC. |

JUSTICE MASON delivered the judgment of the court, with opinion.
Justices Neville and Hyman concurred in the judgment and opinion.


**OPINION**

¶ 1      Plaintiff-appellee Anthony Williams filed suit against defendant-appellant BNSF Railway Company (BNSF) pursuant to the Federal Employers Liability Act (FELA) (45 U.S.C. § 51 (2006)), for an employment-related injury. BNSF filed a third-party complaint for contribution and contractual indemnification against third-party defendant-appellee Quality Terminal Services (QTS). The jury returned a verdict in favor of Williams and awarded total damages in the amount of $2,676,960. The jury assessed 50% of the negligence involved in the injury to Williams, 37.5% to BNSF and 12.5% to QTS. The jury also returned a verdict in favor of QTS on BNSF's contractual indemnity claim.

¶ 2      On September 25, 2013, this court dismissed the appeal for lack of jurisdiction, concluding that because the only issue remaining after the trial court's oral ruling denying BNSF's posttrial motion was a tax setoff issue that did not toll the time for filing an appeal, BNSF's appeal was not timely filed. *Williams v. BNSF Ry. Co.*, 2013 IL App (1st) 121901, ¶ 20. The supreme court reversed and remanded, holding that the judgment was not final until the trial court issued its ruling on the setoff issue, because the trial court's prior oral ruling was not entered in the law record book until that date. *Williams v. BNSF Ry. Co.*, 2015 IL 117444, ¶ 45. Thus, we now address the merits of BNSF's appeal.

¶ 3      On appeal, BNSF contends that the circuit court erred in denying its motion for a directed verdict on the contractual indemnity claim where the evidence established that BNSF gave reasonable notice to QTS. BNSF further contends that the circuit court erred in refusing to allow evidence related to Williams' termination of employment with BNSF. Finally, BNSF contends that the circuit court erred in allowing evidence of the loss of household services, including unsupported opinion testimony regarding the value of those services. We are not persuaded by BNSF's arguments and affirm the judgment of the circuit court of Cook County.


¶ 4                                    BACKGROUND
¶ 5      On August 21, 2003, Williams was working as a crane operator for BNSF and sustained an injury to his back for which he obtained immediate medical attention. The incident occurred at an intermodal rail facility located in Cicero, Illinois, that is owned and operated by BNSF. Williams' employment with BNSF was scheduled to be terminated at the end of his shift, an event that was related to prior disciplinary violations.

¶ 6      The BNSF Cicero yard is a hub for shipping and receiving freight in containers that are placed on and removed from railcar chassis or delivery trucks by the use of a crane operated by an employee, the crane operator, assisted from the ground by another employee, the crane director. The crane operators and directors are BNSF employees but at the time of the incident, the loading and unloading operations at the facility were managed and supervised by QTS pursuant to an "Intermodal Facilities Services Agreement" (Agreement) between QTS and BNSF. The Agreement contained an indemnification clause that required BNSF to give reasonable notice to QTS of any claim that could trigger the indemnification provision.

¶ 7 Following the incident, BNSF initiated an investigation into the circumstances surrounding Williams' injury. In December 2003, BNSF received written notice of an attorney's lien from a law firm retained by Williams to pursue a personal injury claim. BNSF received a second notice of an attorney's lien from a different law firm in March 2005.

¶ 8 Williams filed his complaint against BNSF on August 20, 2006. One of the acts of negligence alleged in the complaint was BNSF's failure to provide Williams with "sufficient manpower" to perform his duties on the date of the accident.

¶ 9 Williams was deposed in May 2007. Williams testified that on the night he was injured he was working alone and that Frank Stephenson, the QTS supervisor on duty, directed him to do so. Pursuant to the Agreement, BNSF submitted a written demand for indemnity to QTS in August 2007, predicated on information BNSF claimed it first learned from Williams' deposition testimony. QTS rejected the demand and BNSF filed a third-party complaint against QTS for contribution and indemnity on August 26, 2008. In response to BNSF's claim for indemnification, QTS raised the affirmative defense that BNSF had not submitted its written demand for indemnification within a "reasonable time" as required under the Agreement.

¶ 10 Prior to trial, Williams filed a motion *in limine* to bar evidence of his termination by BNSF on the grounds that it was not relevant to the issues in the case. At the hearing on the motion, the trial court stated that it did not want a "trial within a trial" where the jurors would concern themselves with whether or not Williams was properly terminated, a proposition with which counsel for BNSF agreed. Counsel for BNSF argued, however, that the termination was relevant to an argument that Williams had a motive to fabricate his injury. During the trial, the trial court again ruled against the admission of the evidence, particularly because there was no evidence to suggest that Williams knew he was going to be terminated that day, thus undermining any motive BNSF could ascribe to him.

¶ 11 Also prior to trial, the trial court denied QTS' motion for summary judgment on the timeliness of BNSF's demand for indemnification under the Agreement. The court found that there existed genuine issues of material fact regarding when BNSF knew or should have known that the negligence of a QTS employee caused, in whole or in part, Williams' injury and that whether BNSF submitted its demand for indemnification within a "reasonable time" presented an issue for the jury.

¶ 12 The trial of the case spanned nine days. More than a dozen witnesses testified. Of the 46 assignments of error raised in BNSF's posttrial motion, BNSF has elected to pursue only 3 of those on appeal. We summarize only so much of the evidence as is necessary to a discussion of these issues.

¶ 13 At trial, Williams testified that he was employed by BNSF at the time of the injury and was working at the Cicero yard as a crane operator. He had previously worked as a crane director. Williams explained that a crane director needs to be in a position on the ground that allows the director to see areas that the crane operator cannot see from inside the cab of the crane. The director lets the operator know whether it is safe to move the crane and if there are any obstacles. A crane director and a crane operator work as a team, with the operator using the crane to lift the trailer or container and the director providing direction. It was BNSF's policy that any time a crane is in operation, a director must be on the ground providing verbal directions and hand signals to the operator.

¶ 14 Williams explained that the team is taken out to the track by the ramp supervisor. Ramp supervisors are QTS employees. The crane operator-director team performs what are referred to as "flips." A flip is performed by taking a container off the ground or off a chassis and loading it onto another chassis. A "live flip" occurs when a truck driver is in the yard waiting while the team removes the container from the truck, while an "in-house flip" involves a container that is already in the yard and needs to be moved to another chassis. For in-house flips, the crane director unlocks the container from the chassis it is currently on and sets up the other chassis to receive it. The crane director then indicates to the crane operator that it is safe to move the container and also indicates whether or not it needs to be adjusted in any way once it is placed on the chassis. After the container is seated flush on the correct chassis, it is locked in place by the crane director. Each chassis has front and rear locks and the lock may be a twist lock or a push/pull pin with a handle.

¶ 15 Williams explained that the tool most often used by a crane director to lock the container in place is a five-iron. The five-iron is an L-shaped bar with a longer side that is approximately three feet and a shorter side that is approximately six inches. In order to lock the container in place using a push/pull pin type of lock, the pin needs to be pulled out before the container is loaded, and then pushed back through a bolster and into the casting at the base of the container once it is in place on the chassis. The locks are frequently rusty and the five-iron is used to either loosen the safety latch when unlocking or to force the pin through the bolster when locking. Williams stated that at least one pin on each chassis usually had to be locked by striking the five-iron on the pin to get it to fully insert into the casting.

¶ 16 Williams worked the 11 p.m. to 7 a.m. shift on August 20-21, 2003, and Stephenson was his supervisor. Williams and Bonnie Deamon, a crane director, were assigned to work together and Stephenson drove them out to the location of their assignments. They took a lunch break at approximately 3 a.m. in the yard office, a building that included locker rooms for both men and women. Williams took his break in the men's locker room.

¶ 17 At approximately 4 a.m., Stephenson told Williams that he had 12 or 13 in-house flips that he wanted Williams to do. Williams agreed and asked Stephenson to get Deamon so they could go out and take care of the flips. Stephenson said everything was lined up in a straight line so it should not be that difficult and Williams should be able to do it by himself. Despite Williams' stated preference to have his director with him, Stephenson said he was not going to bother Deamon and was just going to take Williams out to the yard. When they arrived at the location where the flips were set up, Williams again said that he preferred to work with his director, but Stephenson directed Williams to perform the flips himself.

¶ 18 After Stephenson left, Williams checked the crane to make sure everything was in working order and then went down the line with the five-iron, setting up and unlocking each chassis. Williams returned to the crane and moved each container onto the correct chassis. Williams then got out of the crane and walked back with the five-iron to lock down each of the containers. When he reached the last container, the pin on the final lock would not go in, so he tapped it with the five-iron and it went in a little but not all the way. Williams then swung the five-iron to strike the pin with more force. As he did so, he felt a pop in his back and immediately felt pins and needles shooting down his lower back and buttocks area and numbness on the outside of his left leg.

- 4 -

¶ 19    Williams returned to the crane and called Stephenson on the radio to tell him he had been injured. Stephenson took Williams back to the yard office and Ross Schoepp, a BNSF manager, took Williams to the hospital.

¶ 20    En route to the hospital, Schoepp first drove Williams to the ramp where he was injured and asked him to describe what happened. When Williams told Schoepp about striking the pin with the five-iron, Schoepp asked him if he had used a jabbing motion with the five-iron or a baseball swing. Williams told Schoepp it was more like a baseball swing.

¶ 21    At trial, Schoepp testified that a baseball swing was not the proper way to use a five-iron. Schoepp further testified that Williams never told him that Stephenson told him to work alone and that, if this was true, consistent with BNSF's policy, Williams should have called the hub manager or refused to do the flips by himself on the grounds that the conditions were unsafe.

¶ 22    Deamon, the crane director assigned to work with Williams the night of the incident, had never known a crane operator to go out and perform 12 to 15 flips alone. Deamon received on-the-job training in the use of the five-iron and said that it was primarily used to unsecure hitches on flatcars, not to lock pins. After an in-house flip, Deamon would not go back and lock the pins.

¶ 23    On the night in question, things were slow so Deamon took an extended lunch break. She explained that when things were slow, she would be placed on lunch break until something came in and someone would then knock on the locker room door and tell her to come back out. That night, nobody knocked on the door until someone came to tell her Williams had been injured. The following day, Fred Jamison, a BNSF supervisor, asked Deamon where she was during the incident and she told him she was in the locker room having lunch and reading a book.

¶ 24    Robert Ellman worked for QTS as the superintendent of the Cicero yard at the time of Williams' injury. Ellman testified that QTS never conducted an investigation of the incident involving Williams because it was never notified by BNSF of an incident that required investigation.

¶ 25    By the time of trial, Williams had been receiving care from an orthopedic surgeon for eight years and the treatment was ongoing. He received injections in his back for pain for a period of three to five months beginning in December 2003. Williams also underwent physical therapy for a period of four years after the incident, during which time he had approximately 80 therapy sessions. He used an electronic stimulator for pain management and occasionally required the use of a cane for assistance when walking. Williams had three different braces for his back to provide different levels of support and continued to take two prescription medications for pain management. Williams testified that his life activities had changed dramatically since the injury. He could no longer do chores around the house, either inside or outside. Walking was more difficult, but resting and sleeping were also difficult because of the pain. He could no longer enjoy outings and activities with his family.

¶ 26    Stan Smith, a forensic economist, rendered opinions regarding damages attributable to Williams' injury. Using standard methodology, Smith calculated Williams' loss of earnings, benefits and the loss of the value of household services Williams could no longer perform. Smith testified that household services typically fall under one of three categories: food preparation, clothing care, and household maintenance and repair. Smith opined that the loss of value of household services over Williams' life expectancy was $657,601. Smith calculated damages related to Williams' lost earning capacity to be $1,733,687 assuming he worked until

the age of 67, and $1,396,821 assuming he retired at age 62. The foregoing totals factored in Williams' receipt of a portion of his pension income since the date of his injury.

¶ 27    Kevin Bell, a BNSF claims representative, investigated the incident. Bell was familiar with the contract between BNSF and QTS, the indemnification clause, and the notice provision. Bell explained that it was one of the responsibilities of the claims representative to determine whether BNSF was going to seek indemnification from QTS.

¶ 28    A day or two after the incident, Bell learned of it from Jamison, the BNSF hub manager at the Cicero yard. Jamison conducted his own investigation into the incident and provided Bell with a statement from Williams. Bell acknowledged that from the statement he could have concluded that Williams had been doing the job of both crane operator and crane director at the time of the injury. Bell learned from Jamison that in the types of flips Williams had been doing, the pins did not need to be locked and that swinging a five-iron to strike the pins was not the proper use of the five-iron.[1] Bell also spoke with Deamon as part of his investigation. She told him she was working as Williams' crane director that night, but did not know anything about the incident. Bell verified that nobody else was identified as being in the area at the time of the incident.

¶ 29    In early December 2003, Bell received a notice of attorney's lien related to the incident involving Williams. The notice stated that Williams had a potential cause of action stemming from negligence in the management and maintenance of the Cicero yard. Bell received a second notice of an attorney's lien from a different law firm in March 2005.

¶ 30    In September 2006, Bell reviewed the complaint filed by Williams that alleged BNSF failed to provide him with sufficient manpower to perform his work. Bell confirmed that the first time he provided written notice to QTS was in August 2007 and explained that he first learned that Williams was ordered to work alone by the QTS manager at Williams' deposition in May 2007.

¶ 31    After the last witness testified, BNSF made an offer of proof of the facts relating to Williams' termination. Williams denied that Schoepp told him at the beginning of his shift on August 21, 2003, that he had to report to Jamison at the end of his shift. BNSF did not supply any evidence that prior to receipt of the termination letter at the end of his shift on August 21, 2003, Williams had been informed or was otherwise aware that he would be terminated that day. The trial court accepted BNSF's offer of proof and denied the motion to reconsider its prior order barring evidence relating to Williams' termination.

¶ 32    The trial court denied BNSF's motion for a directed verdict and Williams' motion for a directed finding that Stephenson was an agent of BNSF. The trial court then addressed QTS' motion for a directed verdict on the issue of indemnification based upon BNSF's delay in providing written notice. Counsel for BNSF orally cross-moved for a directed verdict on the ground that BNSF was not aware prior to Williams' deposition that QTS was potentially at fault for the injury. The trial court denied both motions.

¶ 33    As noted, the jury returned a verdict in favor of Williams and against BNSF in the amount of $2,676,960, consisting of $1,396,821 for past and future lost earning capacity, $328,500 for lost household services, and $951,639 for pain and suffering. The jury attributed 50% of the negligence involved in the injury to Williams, 37.5% to BNSF and 12.5% to QTS. After

---

[1]The court allowed this testimony, not for the truth of the statements in Jamison's report, but as relevant to the notice issue between BNSF and QTS.

reducing Williams' damages by the percentage of negligence, the jury awarded recoverable damages in the amount of $1,338,480. The jury also found in favor of QTS on BNSF's indemnification claim.

¶ 34                                            ANALYSIS

¶ 35     BNSF first argues that it is entitled to judgment against QTS for indemnity as a matter of law because it was not required to give notice until it learned facts showing that Williams' injury arose out of QTS's conduct. We disagree with QTS' argument that BNSF has waived this issue. BNSF made an oral motion for a directed verdict and argued in its posttrial motion that the court erred in sending the indemnification claim to the jury when it should have decided the issue in favor of BNSF as a matter of law. Although the argument section of the posttrial motion focused on the denial of BNSF's summary judgment motion on this issue, it was sufficient to preserve the issue for review.

¶ 36     A directed verdict is appropriate only in those cases where all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could ever stand. *Jablonski v. Ford Motor Co.*, 2011 IL 110096, ¶ 88 (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). We review the denial of a motion for a directed verdict *de novo*. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 37.

¶ 37     As our supreme court has held in the context of insurance policies, notice provisions impose valid prerequisites to coverage. *West American Insurance Co. v. Yorkville National Bank*, 238 Ill. 2d 177, 185 (2010). The timeliness of the notice given is generally a question of fact, but it may be properly determined as a matter of law where the material facts are not in dispute. *Northbrook Property & Casualty Insurance Co. v. Applied Systems, Inc.*, 313 Ill. App. 3d 457, 465 (2000). Factors considered in determining whether notice was reasonable include: (1) the specific language of the policy's notice provisions; (2) the degree of the insured's sophistication in the world of commerce and insurance; (3) the insured's awareness that an occurrence as defined under the terms of the policy has taken place; (4) the insured's diligence and reasonable care in ascertaining whether policy coverage is available once the awareness has occurred; and (5) any prejudice to the insurance company. *West American*, 238 Ill. 2d at 185-86. We believe similar factors are relevant in the context of reasonable notice required in a contractual indemnification clause.

¶ 38     The indemnification clause in the Agreement provides, in relevant part, that QTS will indemnify BNSF from and against any and all claims "which shall arise or result from or in any manner be connected with" an injury to any person "arising directly or indirectly, in whole or in part, from the actions or omissions of QTS or its employees, unless such injury *** is proximately caused by the sole negligence of [BNSF]." The indemnification clause contains the following notice provision:

         "In the event any claim or suit is brought against [BNSF] for which [QTS] is responsible under this Section 5, or in the event any claim or suit is brought against [BNSF] arising out of work performed, materials furnished, or other activities conducted under the terms of this Agreement, for which [QTS] is responsible under the provisions of this Agreement, [BNSF] shall give [QTS] reasonable notice in writing of the pendency of such claims or suit, and upon receipt of such notice, [QTS] shall

forthwith assume the defense of such claim or suit, and shall save and hold harmless [BNSF] from all loss, cost, expense and liability by reason thereof."

¶ 39 BNSF focuses on the first clause of the notice provision, and contends that because it did not know that QTS was responsible until Williams testified in his deposition that he was ordered to work alone by his QTS supervisor, it was under no obligation to provide notice to QTS before then. But we note that the notice provision not only covers claims for which QTS is responsible; it also includes claims arising out of work performed or other activities conducted under the Agreement. Therefore, BNSF was obligated to provide notice to QTS, at the latest, as soon as it received notice of the attorneys' lien in December 2003 because Williams' claim arose out of work performed while under the supervision of QTS as per the Agreement.

¶ 40 But even under the first clause of the notice provision relied on by BNSF, the facts show that BNSF's notice to QTS was unreasonable. Shortly after the injury, BNSF was aware that Williams had been working as a crane operator but was injured while performing the duties of a crane director. BNSF was also aware that Deamon was working as Williams' crane director earlier in the shift, but was not with him at the time of his injury. Bell knew that nobody else was in the area at the time of the injury and, therefore, that Williams was working alone. BNSF's own policy provided that crane operators should not work alone. These facts would have prompted a reasonable person to investigate why Williams was working alone. Moreover, Williams' complaint alleged a "lack of adequate manpower," something that should also have alerted BNSF to investigate further. Under these circumstances, we can discern no justification for BNSF's four-year delay in providing notice to QTS. Thus, BNSF has not established that its notice was reasonable as a matter of law and the trial court did not err in denying BNSF's motion for a directed verdict on the issue of indemnification.

¶ 41 BNSF next argues that the trial court erred in barring evidence that Williams was scheduled to be terminated at the end of his shift on the date of the injury. As a threshold matter, we disagree with Williams' contention that BNSF waived this argument by failing to make a sufficient and timely offer of proof. Williams argues that BNSF should not have waited until the end of trial to submit its offer of proof and alleges that BNSF did not call any witnesses. While the better practice is to make a contemporaneous offer of proof while the witness is on the stand, there is no set requirement for when an offer of proof must be made, and BNSF elicited testimony from Williams and referred to deposition testimony that was part of the record in its offer of proof. This is sufficient to preserve the issue for appeal.

¶ 42 On the merits, BNSF contends that the evidence regarding the termination of Williams' employment was relevant because Smith's calculations of lost earning capacity that the jury relied on in awarding damages did not take into account the fact that Williams no longer worked for BNSF. BNSF further contends that Williams' counsel opened the door to this evidence by raising the issue of discipline and argues that it was prejudiced when it was not allowed to explain that the reason Williams was not disciplined for the incident is because he was terminated, not because he had done nothing wrong. Finally, BNSF contends that this evidence was relevant because it would have established a motive for Williams to fabricate his injury.

¶ 43 Evidentiary rulings are within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). A trial court abuses its discretion when its decision is fanciful, arbitrary, or unreasonable, or where no

reasonable person would take the same view. *Id*. Although a reviewing court may have ruled differently, the trial court's evidentiary rulings may not be reversed absent a clear abuse of discretion. *People v. Hall*, 195 Ill. 2d 1, 20 (2000).

¶ 44    Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence. *People v. Harvey*, 211 Ill. 2d 368, 392 (2004). A trial court may reject evidence on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty, or unfair prejudicial nature. *Id*.

¶ 45    BNSF's first argument for admission of the termination evidence fails because Smith testified that Williams' earning capacity would be unchanged, even if BNSF did not exist. When calculating his lost earning capacity totals, Smith considered salaries earned by crane operators in the same geographic area. Thus, evidence of Williams' termination would have had no impact on the damages award. BNSF's argument that because Williams was injured and unable to work he would not have been able to work for a different company is unavailing. Because Williams was injured and unable to work, he also would not have been able to work for BNSF, whether or not he had been terminated. The fact of his termination simply had no relevance to the damages calculation.

¶ 46    Similarly, BNSF's second argument also fails. BNSF's argument that Williams opened the door to this evidence is not adequately developed in its brief. BNSF cites two isolated questions that were asked of different witnesses and a general proposition from cited authority and then simply states that, because it was not allowed to introduce Williams' termination as the reason for the lack of disciplinary action, this led to an excessive award of damages. Counsel for Williams asked Schoepp whether he would have disciplined Williams if he had seen him using the five-iron in a swinging motion. Counsel for Williams also asked Tony Marquis, an expert witness for QTS, about a rule that provided an employee would be subject to discipline if the directions of the employer's designated representative in charge were not followed.

¶ 47    We will not speculate regarding the correlation between the two questions relating to discipline and the fact that Williams was terminated, nor do we see how the failure to introduce evidence of Williams' termination in response to these questions led to an excessive award of damages. Counsel for Williams did not argue to the jury that they should not find Williams contributorily negligent because Williams was not disciplined for swinging the five-iron in an improper manner. In fact, the jury found Williams contributorily negligent and the damages award was reduced accordingly, refuting the argument that the damages award was excessive because the jury thought Williams had done nothing wrong. Even if the two questions cited by BNSF had opened the door, which we do not believe they did, BNSF has not shown that it was prejudiced by not being allowed to introduce evidence of Williams' termination.

¶ 48    BNSF's third argument in support of evidence of Williams' termination regarding motive fails because, as the trial court correctly noted, BNSF did not present any evidence in its offer of proof that Williams knew he was going to be terminated at the end of his shift. Williams testified that Schoepp did not tell him that he needed to report to Jamison at the end of his shift. Moreover, BNSF acknowledged that, although Schoepp would testify, if called, that he advised Williams that he had to see Jamison before he went home, Schoepp did not know why the instruction was given. Thus, the trial court did not abuse its discretion in barring evidence of Williams' termination.

¶ 49    BNSF's final argument is that the trial court erred in allowing the claim for loss of household services. BNSF first argues that loss of household services is equivalent to loss of consortium, and because loss of consortium is not recoverable in a FELA claim, Williams' claim is an attempted "end-run" around this prohibition. However, damages for loss of household services are allowed in FELA actions. See, *e.g.*, *Rachel v. Consolidated R. Corp.*, 891 F. Supp. 428 (N.D. Ohio 1995) (allowing a claim for loss of household services after noting the defendant did not cite any authority for the proposition that loss of household services are not allowed in FELA actions). Further, the aspect of Williams' damages claim seeking compensation for the value of household services he can no longer perform is not, as BNSF contends, a disguised damages associated with loss of consortium claim. The loss of household services has nothing to do with Williams' relationship with his wife and the effect Williams' injuries had on that relationship was not the subject of proof at trial.

¶ 50    We also reject BNSF's argument that Dr. Smith's testimony regarding the value of the loss of household services should have been barred because it was based on Williams' estimate of the time he spent per week on household services. BNSF relies on *Davis v. Rocor International*, 226 F. Supp. 2d 839, 842 (S.D. Miss. 2002) in which the court barred expert testimony on the value of household services that it said appeared to be based on speculation or conjecture. However, we note that Smith is an economist, not an occupational therapist, and could only provide a value for this aspect of Williams' claim that corresponded to the information he had been provided by Williams, *i.e.*, what chores Williams typically performed around the house prior to his injury and what costs are associated with having those services performed by a third party. The weight and credibility given to Smith's testimony was a matter for the jury. BNSF had ample opportunity to cross-examine both Smith and Williams on the purported value of the loss of household services. Thus, the trial court did not err in allowing this testimony.

¶ 51                                    CONCLUSION

¶ 52    We have carefully examined the claimed errors raised by BNSF in this appeal and find that none of them warrants judgment notwithstanding the verdict (QTS) or a new trial (Williams). Accordingly, we affirm the judgment of the circuit court of Cook County.

¶ 53    Affirmed.