WILLIAM J. CARTER, Ex'r of the Estate of Beverly I. Carter, Deceased, Plaintiff-Appellant, v. CHICAGO & ILLINOIS MIDLAND RAILWAY COMPANY, Defendant-Appellee (William J. Carter, Adm'r of the Estate of Tiffany Leah Carter, Deceased, Plaintiff).

Fourth District   No. 4—84—0441

Opinion filed February 5, 1985.

Knuppel, Grosboll, Becker & Tice, of Petersburg (R. John Alvarez, of counsel), for appellant.

Graham & Graham, of Springfield (Charles E. Holt, of counsel), for appellee.

JUSTICE WEBBER delivered the opinion of the court:

Plaintiff, in his capacity as executor of his deceased wife's estate, brought a wrongful death action in the circuit court of Menard County against the defendant. The cause was tried to a jury which found in favor of the plaintiff and against the defendant, but on comparative negligence principles found the decedent to be 90% at fault. The trial court reduced the verdict accordingly and entered judgment thereon; it also denied plaintiff's post-trial motion. Plaintiff has appealed, claiming that the trial court committed certain errors in ruling on evidence and instructions and that the jury's award was insufficient and against the manifest weight of the evidence. Finding no error, we affirm.

Decedent died instantly when the van which she was driving was struck by one of defendant's trains at a public crossing in Menard County. Decedent was traveling east and the train north at the time of the accident. Plaintiff alleged in his complaint that the defendant was negligent in failing to sound the whistle, in traveling at an unreasonable speed, in failing to maintain a proper lookout, and in failing to maintain the crossing in the proper fashion.

Testimony at trial revealed that the train crew consisted of five persons and the train consisted of three locomotives, four cars, and a caboose. The engineer was seated on the right side of the lead locomotive and the fireman on the left side; the head brakeman was on the right side of the second locomotive, and the rear brakeman and conductor were in the caboose. The fireman had died prior to trial, and since

the van approached the train from its left side, there were no eyewitnesses.

Various witnesses testified as to the sounding of the whistle. The four surviving crew members stated that it was sounded but they were unable to give any precise estimate of distance from the crossing when the sound was made. A witness who lived 535 feet south of the crossing stated that he heard the whistle as the train passed his residence. Another witness who was riding a bicycle about a mile from the crossing did not recall hearing the whistle. A deputy sheriff testified that the engineer told him soon after the accident when he was investigating it that he sounded the whistle at the culvert south of the crossing. He stated that there were two culverts in that area, one 228 yards south of the crossing and another 170 to 200 yards further south.

Testimony regarding speed came from both sides. The crew members testified that the speed was between 30 and 40 miles per hour immediately prior to the collision; the defendant's superintendent testified that 40 miles per hour was the limit imposed by management prerogative. Plaintiff introduced certain speed tapes purported to have been made by a recording device on the train. Plaintiff's expert stated that the tapes showed a speed of 41 or 42 miles per hour immediately before the collision; defendant's expert stated that the tapes showed a speed of "a little over 40 miles an hour." These tapes, and their use at trial, form one of the principal complaints on appeal.

The condition of the crossing was established largely through photographic exhibits. Friends and relatives of the decedent testified as to her familiarity with the crossing and her personal habits and characteristics, which were said to be exemplary. An economist, testifying as an expert, fixed the pecuniary loss attributable to her death at $259,000.

The jury returned a verdict for the plaintiff in the sum of $120,000 together with a finding of 90% negligence on the part of the decedent. Plaintiff's recovery then became $12,000. His post-trial motion was denied, and this appeal ensued.

■ Plaintiff's first contention centers upon the speed tapes. He claims that although he introduced them into evidence as his exhibits, he should have been permitted to attack their authenticity; he also maintains that he should have been permitted to show that the defendant initially failed to disclose their existence.

The accident occurred on October 9, 1981; plaintiff filed suit on February 10, 1982, and submitted a set of interrogatories and motion to produce to the defendant. On April 23, 1982, defendant answered and stated that no speed recording device was on the train. Later on, early in 1983, defendant disclosed that a speed tape did exist and pro-

vided plaintiff with a copy of it on March 16, 1983. Trial began on January 9, 1984.

Prior to trial, plaintiff indicated that he wished to call the jury's attention to this delay in disclosure and that he planned to attack the authenticity of the speed tapes. The defendant then stated that it did not intend to introduce the speed tapes into evidence. The trial court ruled that the plaintiff would not be allowed to call the jury's attention to the disclosure violation since he had not been prejudiced by the delay. The court also ruled that if the plaintiff chose to introduce the speed tapes into evidence, he could not later attack their authenticity. Plaintiff now contends that these rulings were erroneous.

A party, when faced with a discovery violation, generally a nondisclosure or a late disclosure, may approach the problem from either of two directions, depending on the nature of the evidence. If the evidence is favorable to him, he may wish it to be introduced, but he may also wish to place before the trier of fact the misbehavior of the other party. On the other hand, if the evidence is not favorable to him, he may wish to debar it altogether. These different approaches are governed by different principles of law.

Debarring of the evidence itself is a sanction for nondisclosure or late disclosure and is governed by Supreme Court Rule 219(c) (87 Ill. 2d R. 219(c)). Admission of the fact of nondisclosure or late disclosure is governed by ordinary common law principles of evidence, that is, relevancy, competency and materiality. Professor Wigmore classifies it as a consciousness of guilt. 2 Wigmore, Evidence sec. 267 (3d ed. 1940).

Either approach rests fundamentally on the discretion of the trial court. Two prior authorities demonstrate the principles involved.

*Carlson v. General Motors Corp.* (1972), 9 Ill. App. 3d 606, 289 N.E.2d 439, was a clear case of sanctions. The appellate court reversed a jury verdict for the defendant General Motors because of the admission at trial of certain expert testimony not revealed in discovery. *LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 343 N.E.2d 65, appears to be the other species of case, the court first discussing Professor Wigmore's common law approach, but then departing from that theory to cite and follow *Carlson*, which, as we have said, was a sanction case. In any event, we believe that the *LeMaster* court's statement, "Herein, judicial sanctions were not sought" (35 Ill. App. 3d 1001, 1012, 343 N.E.2d 65, 75) places it squarely in the common law category.

In the case at bar we believe that the theory of placing before the jury, *i.e.*, admitting evidence, defendant's actions with regard to the speed tapes was that of common law evidence and not sanctions. Since

all of the events, the first denial of the existence of the tapes and then their production, occurred more than nine months before trial, that evidence was too remote to be probative and relevant. The trial court did not abuse its discretion in denying admission, and hence no error was committed in this ruling.

■■ We are of the same opinion concerning the trial court's refusal to allow plaintiff to attack the authenticity of the tapes which he had introduced. In oral argument, plaintiff's counsel suggested that the purpose of introducing the tapes was the same as his effort to introduce evidence of the discovery violation, *viz.*, consciousness of guilt on the part of the defendant. However, this is not borne out by the record. In an offer of proof outside the presence of the jury concerning the tapes, it was stated that the basis for the offer was to demonstrate the "fabrication" of the tapes. Nowhere in the offer is any statement made about the general credibility of the defendant or its consciousness of guilt.

In order to introduce the tapes, plaintiff was first required to establish the necessary foundation evidence. (Compare *Thompson v. Chicago & Eastern Illinois R.R. Co.* (1961), 32 Ill. App. 2d 397, 178 N.E.2d 151.) Having done so, it does not lie in his mouth then to attack the authenticity of those exhibits. As the trial court noted, such conduct is illogical and serves only to distract the jury from the relevant issues. No error occurred.

■■ Plaintiff next assigns as error the manner in which the trial court handled the question of his remarriage as it related to his loss of consortium.

The trial court, in a ruling during the trial, stated that evidence of the plaintiff's remarriage would not be allowed if the plaintiff chose not to seek damages for loss of consortium. The court noted that the plaintiff had already tendered a jury instruction which included loss of consortium as an element of damages recoverable by the defendant. The court gave the plaintiff the option of either deleting the language regarding loss of consortium or leaving the language in the instruction and adding language that would indicate that the loss-of-consortium damages would be calculated only up to the date of the plaintiff's remarriage. The court stated that if loss-of-consortium damages were sought, it would also give a limiting instruction that the plaintiff's remarriage would not affect any other element of damages or liability.

The plaintiff elected not to include loss of consortium as an element of damage and thus insured that the fact of his remarriage would not be brought to the attention of the jury.

In *Elliott v. Willis* (1982), 92 Ill. 2d 530, 442 N.E.2d 163, our supreme court held that loss of consortium should be included as an ele-

ment of damage in wrongful death cases. Prior thereto such loss was not included, and prior to 1967, various limitations existed from time to time on the amount of damages recoverable. It had therefore been held that the remarriage of the surviving spouse was irrelevant to the determination of damages but was pertinent to the selection of a fair and impartial jury. *Watson v. Fischbach* (1973), 54 Ill. 2d 498, 301 N.E.2d 303.

Plaintiff argues that *Elliott* did not purport to limit *Watson* and therefore *Watson* should be followed. Defendant argues that plaintiff has waived the question by failing to adhere to his objection and withdrawing his request for damages for loss of consortium. We do not agree with either position.

As to waiver, plaintiff objected at the time of the ruling and raised the point in his post-trial motion. The trial court noted that plaintiff's decision was not entirely voluntary. There was no waiver.

■ Plaintiff's argument must also fail. When the supreme court announces a new principle of law, it must be understood that all prior authority in conflict therewith becomes enervated, whether specifically or *sub silentio*. To undertake to seek out and overrule every prior case would be a fruitless and endless task and customarily is not done by that court; *e.g.*, when the doctrine of comparative negligence was announced, there was no specific overruling of all cases dealing with contributory negligence; it simply followed that the former cases were no longer good law.

■ So in the instant case, if loss of consortium is sought, it must be actual loss; that is, loss up to the time of remarriage. It may be true, as plaintiff argues, that consortium with the deceased spouse may have been of a different quality from that with the present spouse, but such speculations could lead only to Aristophanes' Nepheloccocygia.

The trial court's ruling was sensible and logical. There was no error.

■ We turn next to plaintiff's complaints concerning the verdict: (1) that it was against the manifest weight of the evidence, and (2) that it was inadequate.

Plaintiff's principal contention under the manifest weight argument is that the evidence did not bear out a 90% apportionment of negligence to the decedent. He points to the statutory duty to sound the whistle at a distance of at least 80 rods (1,320 feet) from the crossing. (Ill. Rev. Stat. 1983, ch. 114, par. 59.) We have already reviewed the evidence concerning the whistle. There is no clear indication one way or another as to the distance. The jury could have concluded that the whistle was sounded in substantial compliance with the statute.

Plaintiff also points to the evidence of speed, which we have also reviewed. All of that evidence points to a speed of 40 miles per hour or slightly more. In the absence of evidence that the speed of the train contributed to the accident, the jury could have concluded that the speed was reasonable and consistent with ordinary care, as they were instructed.

As to keeping a lookout, plaintiff's third contention under this general complaint, he presented no evidence to indicate that the train crew failed in this respect.

Plaintiff also contends that the crossing was ill-kept. However, the record is to the contrary. A photographic exhibit taken from a point 100 feet west of the crossing and looking eastward, as the decedent's van would have been traveling, shows a train plainly visible 606 feet south of the crossing.

In short, it is the function of the jury to weigh these matters and to determine the credibility of the witnesses. (*McCommons v. Moorman Manufacturing* (1980), 81 Ill. App. 3d 708, 401 N.E.2d 1354.) If that jury is properly instructed (and except for the matter of loss of consortium no such contention is made here) and has a reasonable basis for its award, a reviewing court will not, and should not, disturb its verdict. (*Ford v. Baker* (1978), 61 Ill. App. 3d 45, 377 N.E.2d 853.) We find no reason here not to follow these familiar rules of law.

■■ The same holds true concerning the contention of inadequacy of the verdict. Although the expert placed the present value of pecuniary loss attributable to the decedent's death at $258,966.30, the jury was not bound by that figure. The question of a damage award is peculiarly within the province of the jury under our system of law, and as with the manifest weight question, reviewing courts should keep their hands off unless the amount is palpably inadequate. *Flynn v. Vancil* (1968), 41 Ill. 2d 236, 242 N.E.2d 237; *Fisher v. Patel* (1981), 93 Ill. App. 3d 694, 417 N.E.2d 691.

For all the foregoing reasons, the judgment of the circuit court of Menard County is affirmed.

Affirmed.

GREEN, P.J., and TRAPP, J., concur.