2023 IL App (3d) 220232

Opinion filed May 10, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| PAUL PASSAFIUME, as Independent Administrator of the Estate of Lois Passafiume, Deceased, | ) ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, Grundy County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | Appeal No. 3-22-0232 Circuit No. 17-L-7 |
| DANIEL JURAK, D.O., and DANIEL JURAK, D.O., S.C., | ) ) ) | Honorable Lance R. Peterson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court, with opinion.
Presiding Justice Holdridge and Justice Albrecht concurred in the judgment and
opinion.

_____

**OPINION**

¶ 1        Plaintiff, Paul Passafiume, acting as an independent administrator of Lois Passafiume's

estate, filed a complaint against, *inter alia*, defendant, Daniel Jurak, alleging medical malpractice

and seeking recovery under the Wrongful Death Act (740 ILCS 180/2 (West 2014)).[1] Lois passed

away at age 34. A jury found Jurak, Lois's primary care physician, negligent in his management

_____

        [1] Plaintiff also sought recovery under the Survival Act (755 ILCS 5/27-6 (West 2014)), not at
issue here.

of her blood clot. The jury awarded $2,121,914.34 in damages, which was reduced to $1,697,531.48 based on its finding that Lois was contributorily negligent. Jurak only challenges the damages award. His primary argument is that the trial court erred by allowing the jury to consider damages for the loss of material services (*i.e.*, household chores) beyond the date of plaintiff's remarriage. For the reasons that follow, we affirm.

¶ 2                                        I. BACKGROUND

¶ 3                                   A. Motions *in Limine*

¶ 4        Prior to trial, Jurak filed several motions *in limine* seeking to limit evidence concerning the value of lost household services beyond the date of plaintiff's remarriage, which occurred approximately 15 months after Lois's death. In motion *in limine* No. 20, Jurak moved to bar plaintiff's expert, economist Stan Smith, from offering opinions and calculations regarding plaintiff's loss of household services and family guidance/accompaniment. As to household services, Jurak argued that Smith's testimony was speculative in that it spoke more to general labor trends than to the specific household services provided by Lois. As to both household services and family guidance/accompaniment, Jurak also argued that, as part of a consortium claim, these elements were not amenable to expert testimony addressing the commercial value of those services. Jurak contended that such testimony was at best marginally relevant and had the potential to mislead the jury.

¶ 5        In motion *in limine* No. 25, Jurak moved in the alternative to limit any of Smith's opinions and calculations regarding plaintiff's loss of household services to the period preceding plaintiff's remarriage. Jurak essentially argued as follows. Material services, *i.e.*, household services, were part of a consortium claim. Further, the components of a consortium claim—loss of material services, loss of society, loss of companionship, etc.—composed a conceptualistic unity that could

2

not be dismembered into material and sentimental benefits. That plaintiff was able to place a monetary value on the loss of household services does not, in Jurak's view, remove the loss of household services from a consortium claim. Damages for loss of consortium terminate upon remarriage (*Carter v. Chicago & Illinois Midland Ry. Co.*, 130 Ill. App. 3d 431, 436 (1985)), and, as household services were an indivisible part of a consortium claim, damages for loss of household services also terminate upon remarriage. Jurak relied on *Dotson v. Sears, Roebuck & Co.*, 157 Ill. App. 3d 1036 (1987) (*Dotson I*), and *Dotson v. Sears, Roebuck & Co.*, 199 Ill. App. 3d 526 (1990) (*Dotson II*) (First District cases interpreting *Elliott v. Willis*, 92 Ill. 2d 530 (1982)), in support of his position.

¶ 6        Plaintiff responded to Jurak's motion *in limine* No. 25 as follows. Plaintiff accepted *Carter*'s holding that damages for loss of consortium terminate upon remarriage. He continued, nevertheless, that loss of consortium and loss of financial support are distinct and independent remedies under the Wrongful Death Act. Damages for loss of financial support *do* continue beyond the date of remarriage. The loss of material services should be categorized as the loss of financial support rather than the loss of consortium. And, as the law permits damages for the loss of financial support to extend beyond the date of remarriage, Smith should be permitted to testify to opinions and calculations regarding plaintiff's loss of material services beyond the date of plaintiff's remarriage. Plaintiff relied on *Pfeifer v. Canyon Construction Co.*, 253 Ill. App. 3d 1017 (1993), in support of his position.

¶ 7        The trial court ruled as follows. As to motion *in limine* No. 20, it would allow the expert to testify to opinions and calculations regarding the loss of household services, but it would bar the expert from testifying to the same regarding the loss of family guidance/accompaniment. As to motion *in limine* No. 25, it would allow evidence, including expert testimony, concerning the value

3

of plaintiff's loss of household services beyond the date of plaintiff's remarriage. Addressing both rulings in conjunction, the court explained:

"[T]he two cases are *Dotson* and *Pfeifer*. I've read them both. *** When you read *Pfeifer*, [the] logic to me [is] that these types of household services that can be easily quantifiable just like lost wages, just like financial support[.] *** [In contrast,] *Pfeifer* just cites Black's Law definition [of consortium], [and] it's all about personal, very personal relationship things that *** a jury is the only entity that can place a dollar amount on[.] [Y]ou can't have some expert quantify that [personal relationship], unlike financial support, unlike what it would cost to have your house cleaned, your dishes done[,] and your yard mowed. *So I am going to make a ruling that they are not part of loss of consortium *** . So [Smith] will be allowed to testify beyond the remarriage date on that one portion, that household services portion that I allowed." (Emphasis added.)

¶ 8                                    B. Trial

¶ 9          At trial, Smith, qualified as an expert economist, testified that plaintiff retained him to analyze plaintiff's loss following Lois's death. Smith opined that the value of plaintiff's loss of financial support, calculated by taking Lois's lost wages plus Lois's lost employment benefits minus her personal consumption, was $913,881. Smith considered that Lois, who had a high school degree, had been working as a clerk for the Village of Braceville for the last seven years. The position was for 30 hours per week. Lois's salary had been rising at a steady rate and, in 2013, her last full year of employment, she earned $23,700. In addition, she received IRA and Social Security benefits. Smith accounted for continued salary growth, anticipating that Lois would be earning $35,000 in 2021. However, Smith also attributed a discount value to future earnings, explaining for example that the present cash value of $1000 to be received 10 years in the future might be

4

approximately $900 due to lost investment potential. Smith stated that his numbers should be adjusted upward 2 to 3% due to inflation that occurred from the 2020 date the analysis was completed to the 2021 date of the trial. Smith considered that Paul had stated that Lois enjoyed her job and planned to work as long as she remained healthy. Smith's total value of $913,881 was based on a retirement age of 67. However, if the jury believed that Lois would have retired at 57 or 77, they could subtract or add approximately $28,500 per year.

¶ 10        Smith further opined that the value of plaintiff's loss of household services was $998,158. Smith explained that economists have been placing economic values on household services for decades. Smith had received information from plaintiff about the nature of Lois's housekeeping. Lois and plaintiff had lived in a three-bedroom, single family home. Lois cleaned, cooked, did laundry, did yard work, and helped pay the bills. On average, she spent two to three hours per day doing these sorts of chores. Smith also considered data tables that projected over time how much time Lois might spend performing such tasks in the future.

¶ 11        Jurak's counsel unsuccessfully objected numerous times during Smith's testimony, stating "objection, motion *in limine*, preservation." One such objection occurred following Smith's testimony that he generally assumes a person will do some amount of housework for as long as the person is physically able.

¶ 12        On cross-examination, Smith further explained the $998,158 calculation for loss of household services. From his data, he knew that the average wage for those who perform household tasks, such as "painters, child care workers, waiters and waitresses, private household cooks, laundry and dry cleaning workers, maids, housekeeping cleaners, ***, auditing clerks, [and] taxi drivers and chauffeurs[,]" was $14.99 per hour. He determined that the tasks plaintiff reported Lois to have performed, dishes, laundry, and the like, fit into the aforementioned umbrella

5

category. Smith also added a non-wage component, explaining that employing such workers typically requires a 50% finders' fee. Smith was mindful that Braceville was a smaller community, and therefore, he did not consider higher fees in the range of $40 to $65 per hour that residents of large metropolitan areas pay for cleaning services.

¶ 13   Jurak's counsel then submitted an offer of proof by further questioning Smith. Smith clarified that he did not account for plaintiff's late December 2015 remarriage in calculating lost household services. Referring to his chart, however, Smith calculated that the damages through the end of 2015 for the loss of household services were $24,808.

¶ 14   Plaintiff testified that he and Lois were married in 2007, when he was 32 and she was 26. When plaintiff met Lois, she worked at McDonalds. At McDonalds, Lois had worked her way up to be a manager. In 2008, Lois began working as a clerk for the Village of Braceville. Lois enjoyed her job at the village, where she continued to work up until the time of her death.

¶ 15   On cross-examination, plaintiff testified that, after Lois's death in September 2014, he remarried in December of 2015. On redirect, over Jurak's objection, plaintiff further testified that his second marriage ended in divorce approximately 18 months later. Moreover, following Lois's death, he was sad, lonely, and "not good." By "not good," he meant that he "wasn't thinking right" and he was "all over the place."

¶ 16                              C. Jury Instructions and Verdict

¶ 17   At the jury instruction conference, Jurak did not object to plaintiff's instruction Nos. 19 and 32. Instruction No. 19 was the standard Illinois Pattern Jury Instructions, Civil, No. 31.04 (rev. June 18, 2021) (hereinafter IPI Civil) "Measure of Damages—Wrongful Death—Adult Decedent—Widow and/or Lineal Next of Kin Surviving." IPI Civil No. 31.04 provides:

6

"If you decide for the plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate the [lineal next of kin, [or] widow] of the decedent for the pecuniary loss proved by the evidence to have resulted to the [lineal next of kin] of the decedent. 'Pecuniary loss' may include loss of money, benefits, goods, services, [and] society [and sexual relations].

Where a decedent leaves [lineal next of kin], the law recognizes a presumption that the [lineal next of kin] have sustained some substantial pecuniary loss by reason of the death. The weight to be given this presumption is for you to decide from the evidence in this case.

In determining pecuniary loss, you may consider what the evidence shows concerning the following:

[1. What (money,) (benefits,) (goods,) (and) (services) the decedent customarily contributed in the past;]

[2. What (money,) (benefits,) (goods,) (and) (services) the decedent was likely to have contributed in the future;]

[3. Decedent's personal expenses (and other deductions);]

[4. What instruction, moral training, and superintendence of education the decedent might reasonably have been expected to give decedent's child had decedent lived;]

[5. Decedent's age;]

[6. Decedent's health;]

[7. Decedent's habits of (industry,) (sobriety,) (and) (thrift);]

[8. Decedent's occupational abilities;]

[9. The grief, sorrow, and mental suffering of [next of kin];]

[10. The relationship between [lineal next of kin, e.g. son] and [decedent].]

[11. The marital relationship that existed between [widow/widower] and [decedent].]

[Widow/widower] is not entitled to damages for loss of [decedent's] society and sexual relations after [date of remarriage]" *Id.*

Applied to the instant case, instruction No. 19 omitted as inapplicable paragraphs 4 (regarding a decedent's child) and paragraph 10 (regarding a plaintiff's lineal, non-spousal relationship to the decedent). Instruction No. 19 retained the instructions specific to the spousal relationship, including that the widower is not entitled to damages for the loss of the decedent's loss of society and sexual relations after the date of remarriage. The jury was also instructed that "society" was "the mutual benefits that each family member receives from the other's continued existence, including love, affection, care, attention, companionship, comfort, guidance, and protection." See IPI Civil No. 31.11.

¶ 18        Instruction No. 32 was IPI Civil No. 45.01B (approved Dec. 8, 2011), titled "Verdict Form B—Single Plaintiff and Defendant—Contributory Negligence—Less than 50%." IPI Civil No. 45.01B provides in pertinent part:

"First: Without taking into consideration the question of reduction of damages due to the negligence of [plaintiff's name], we find that the total amount of damages suffered by [plaintiff's name] as a proximate result of the occurrence in question is ____$, [itemized as follows:]" *Id.*

Applied to the instant case, instruction No. 32 combined lost earnings and lost household services as a single-line item and set forth the other categories of loss as follows:

"Medical and/or Funeral Expenses: $_____.

8

The Value of Earnings and Household Services Lost and the present cash value of the Earnings and Household Services reasonably certain to be lost in the future: $_____.

Pain and suffering (Lois): $_____.

Loss of Society for Paul Passafiume: $_____.

The Grief, Sorrow, and Mental Suffering of Paul Passafiume: $_____.

PLAINTIFF'S TOTAL DAMAGES: $_____."

¶ 19 The jury returned a verdict for plaintiff, reducing the judgment 20% to account for Lois's contributory negligence. Prior to the reduction, the jury's breakdown of damages had been as follows:

"Medical and/or Funeral Expenses: $12,139.34.

The Value of Earnings and Household Services Lost and the present cash value of the Earnings and Household Services reasonably certain to be lost in the future: $1,434,025.

Pain and suffering (Lois): $200,000.

Loss of Society for Paul Passafiume: $75,750.

The Grief, Sorrow, and Mental Suffering of Paul Passafiume: $400,000.

PLAINTIFF'S TOTAL DAMAGES: $2,121,914.34."

¶ 20 D. Jurak's Posttrial Motion

9

¶ 21　　　　Jurak filed a posttrial motion, seeking a new trial or, in the alternative, a remittitur. Jurak argued that the trial court's evidentiary rulings on motion *in limine* Nos. 20 and 25[2] constituted reversible error. In Jurak's view, the court's error stemmed from its failure to recognize that household services, performed by a spouse as part of the marital relationship, were an element of consortium and, as such, were not subject to monetization by an expert and were not to be considered beyond the date of remarriage. Jurak continued that the remarriage issue, which had been set forth in motion *in limine* No. 25, represented "99 percent" of his motion.

¶ 22　　　　Plaintiff responded that Jurak forfeited the remarriage issue because Jurak had consented to instruction No. 32, the verdict form that set forth lost earnings and lost household services as a single line item. Plaintiff further urged that the general verdict rule precluded recovery, in that Jurak cannot establish that the entire $1.4 million award for the combined category was not, in fact, for lost earnings alone. While the expert testified to $913,881 in lost wages, that number assumed a retirement age of 67 and did not account for increased hours or a promotion.

¶ 23　　　　Jurak replied that, despite the combined structure of the verdict form, the prejudice was obvious. The expert testified to only $913,881 in lost wages. Therefore, Jurak believed that it was clear that the $1.4 million award was an excess verdict, which the jury reached in part due to its incorrect belief that it could consider evidence of nearly $1 million in lost household services beyond the date of remarriage. Jurak sought a new trial or, in the alternative, a remittitur and a new award to include only $913,881 for lost wages and approximately $25,000 for lost household services prior to the date of remarriage.

---

[2] Posttrial, neither the parties nor the trial court consistently linked their arguments and analysis back to the identifying motion *in limine* numbers. We do so for clarity.

¶ 24     On May 10, 2022, the trial court denied Jurak's motion for a new trial on damages or, in the alternative, remittitur. As to motion *in limine* No. 20, the court explained that, under its reading of *Pfeifer*:

> "[H]ousehold services were tangible *** and more akin to lost earnings rather than the other amorphous elements of loss of consortium (loss of society, sexual relations, companionship). Further, this court [originally] concluded that the report of Dr. Smith along with his interview of [plaintiff] established a proper foundation for his testimony placing a monetary value on the household services of Lois. His opinions were in part based on objective information and statistics all properly disclosed in discovery. His testimony was subjected to vigorous cross-examination and the jury was free to accept or reject such testimony. Defendant could have offered expert testimony to rebut Dr. Smith but chose not to."

¶ 25     As to motion *in limine* No. 25, the trial court explained that Jurak did not properly preserve the remarriage issue because Jurak did not object to plaintiff's jury instruction No. 19, which limited damages for loss of society and sexual relations prior to the time of remarriage but did not limit damages for the loss of services prior to the time of remarriage. Also, Jurak did not object to plaintiff's jury instruction No. 32, verdict form B, which placed lost household services and as lost earnings on the same line but placed loss of society on a different line.

¶ 26     This timely appeal followed.

¶ 27                              II. ANALYSIS

¶ 28     On appeal, Jurak again argues that the trial court's evidentiary rulings on motion *in limine* Nos. 20 and 25 constituted reversible error. Ordinarily, evidentiary decisions are reviewed for an abuse of discretion. *People v. Drum*, 321 Ill. App. 3d 1005, 1009 (2001). A trial court abuses its

11

discretion when its decision is arbitrary, fanciful, or unreasonable. *People v. Patterson*, 2014 IL 115102, ¶ 114. However, this case also involves a legal question—whether the trial court properly understood a statutory wrongful death action to allow for a plaintiff to recover for the loss of material services independent of any recovery for loss of the marital relationship—which we review *de novo*. See *Drum*, 321 Ill. App. 3d at 1009.

¶ 29     Specifically, Jurak argues that a loss of consortium includes material services; material services are inseparable from other elements of consortium; as part of the consortium, material services share the same elusive traits as other consortium elements that render expert, fair-market valuation inappropriate; and like any other element of consortium, damages for the loss of material services terminate upon remarriage. Jurak's argument fails primarily because he incorrectly equates a statutory wrongful death action, which plaintiff filed, with a common law loss of consortium action, which plaintiff did not file.

¶ 30     Before we discuss differences in these causes of action, we must preliminarily address the trial court's forfeiture determination. We disagree that Jurak failed to preserve his argument that the trial court erred in allowing the jury to consider damages for the loss of household services beyond the date of remarriage. Jurak objected at trial and in a posttrial motion. See *Simmons v. Garces*, 198 Ill. 2d 541, 569 (2002) (when the court denies a motion *in limine*, the party must make an objection at trial to preserve the issue on appeal); 735 ILCS 5/2-1202(e) (West 2014) (following a civil jury trial, any party who fails to seek a new trial in his or her posttrial motion waives the right to apply for a new trial). Expecting Jurak to offer as an alternative to jury instruction No. 19—which specified that damages for loss of society and sexual relations ended upon remarriage—an instruction that damages for loss of society, sexual relations, *and* household services end upon remarriage places too great a burden on Jurak as a litigant and makes little sense

12

in the context of this case. Jurak already argued *in limine* and objected at trial that evidence concerning damages for lost household services should not extend beyond remarriage. The court had made its decision, prior to the instruction conference, that damages for loss of household services did not end upon remarriage. We also disagree that Jurak's failure to offer an alternative to instruction No. 32, verdict form B, resulted in forfeiture of the material services and remarriage issues. Placing lost earnings and lost household services on the same line merely made it more difficult to discern prejudice resulting from the admission of the evidence pertaining to household services. However, as we determine that the trial court did not err in admitting the evidence, we need not address prejudice.

¶ 31                     A. History of Recovery for the Loss of Material Services

¶ 32        Historically, both statutory wrongful death actions and common law loss of consortium actions allowed recovery for the loss of a material services formerly performed by the decedent spouse. However, statutory wrongful death actions allowed for damages beyond the date of a plaintiff's remarriage whereas common law loss of consortium actions did not. In 1982, the supreme court held that a plaintiff was permitted to seek damages for loss of consortium within a statutory wrongful death action. See *Elliott*, 92 Ill. 2d at 541. Remarriage was not an issue in *Elliott*. Since *Elliott*, four key appellate cases—*Carter* (Fourth District), *Dotson I* and *Dotson II* (First District), and *Pfeifer* (Second District)—have addressed new challenges associated with the admission of evidence concerning material services and the ability to recover for the loss of material services beyond the date of a plaintiff's remarriage. We address these cases to the extent they inform the premises underlying our analysis.

¶ 33                     1. Pre-*Elliott* Cases Under the Wrongful Death Act: *Watson*

¶ 34    We first consider pre-*Elliott* actions brought under the Wrongful Death Act. Section 2(a) of the Wrongful Death Act, which in pertinent part has remained constant since before *Elliott*, provides:

> "Every such action shall be brought by and in the names of the personal representatives of such deceased person, and, except as otherwise hereinafter provided, the amount recovered in every such action shall be for the exclusive benefit of the surviving spouse and next of kin of such deceased person. In every such action the jury may give such damages as they shall deem a fair and *just compensation with reference to the pecuniary injuries resulting from such death* \*\*\*." (Emphasis added.) 740 ILCS 180/2(a) (West 2014).

See also *Elliott*, 92 Ill. 2d at 534 (citing Ill. Rev. Stat. 1975, ch. 70, ¶ 2).

¶ 35    A growing body of case law has addressed what constitutes a pecuniary injury under the Wrongful Death Act. A decedent's lineal next of kin and spouse are presumed to have suffered pecuniary loss upon the decedent's wrongful death. *Hall v. Gillins*, 13 Ill. 2d 26, 31 (1958). The loss of material services formerly performed by the decedent for her lineal next of kin and spouse has long been recoverable as a pecuniary loss in wrongful death actions. See *Dodson v. Richter*, 34 Ill. App. 2d 22, 24 (1962) (the decedent was a wife and mother of teenage and adult children who performed work in and about the family home—including washing, gardening, cooking, making clothing, tending livestock, and helping the husband with his bookkeeping—and the loss of these services were recoverable as a pecuniary loss); *McFarlane v. Chicago City Ry. Co.*, 288 Ill. 476 (1919); see also IPI Civil No. 31.04. The remarriage of the plaintiff, or the possibility thereof, does not affect damages recoverable for the wrongful death of the deceased spouse. *Watson v. Fischbach*, 54 Ill. 2d 498, 500 (1973). The rationale is that a defendant should not be permitted to introduce evidence, for the purpose of mitigating damages, that shows the plaintiff

14

has received a benefit incident to the complained-of injury from a collateral independent source. *McCullough v. McTavish*, 62 Ill. App. 3d 1041, 1048 (1978).

¶ 36                    2. Pre-*Elliott* Cases in Common Law for Loss of Consortium: *Dini*

¶ 37        We next consider pre-*Elliott* actions in common law for loss of consortium. Unlike a wrongful-death action, which may be filed by a lineal next of kin or a spouse, a loss-of-consortium action can only be filed by a spouse. Black's Law Dictionary has defined consortium as a " 'conjugal fellowship' " between husband and wife and the right of each to " 'the company, society, co-operation, affection, and aid of the other in every conjugal relation.' " *Pfeifer*, 253 Ill. App. 3d at 1028 (quoting Black's Law Dictionary 280 (5th ed. 1979)). Black's Law Dictionary defines the loss of consortium as " 'loss of society, affection, assistance, and conjugal fellowship, and includes the loss or impairment of sexual relations.' " *Id.* (quoting Black's Law Dictionary 280 (5th ed. 1979). Merriam-Webster defines conjugal as "of or relating to the married state or to married persons and their relations." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/conjugal (last visited May 2, 2023) [https://perma.cc/YFG9-E8AU]. Consortium is unique to the marriage partner. *Mitchell v. White Motor Co.*, 58 Ill. 2d 159, 162 (1974). The elements of loss of consortium have been described as "indefinitely measured damages." *Coulter v. Renshaw*, 94 Ill. App. 3d 93, 96-97 (1981).

¶ 38        Despite the amorphous and highly personal nature of consortium, there is support in the case law for the inclusion of material services, *i.e.*, household services or chores, as an element of loss of consortium. In *Dini*, the supreme court recounted the history of the common law action for loss of consortium in the context of deciding, for the first time, that the action was not exclusive to husbands. *Dini v. Naiditch*, 20 Ill. 2d 406 (1960). Prior to *Dini*, only husbands could file an action for loss of consortium: "Since the husband was entitled to his wife's services in the home,

15

as he was to those of any servant in his employ, if he lost those services through the acts of another, that person had to respond in damages." *Id.* at 422. The *Dini* court determined that, as a wife is no longer her husband's chattel, the law must accordingly change to recognize that "a husband's right to the conjugal society of his wife is no greater than hers, [and] an invasion of the wife's conjugal interests merits the same protection of the law as an invasion of the husband's conjugal interests." *Id.* at 429-30.

¶ 39     In defending its position, the *Dini* court addressed the concern of double recovery. *Id.* at 426-27. The *Dini* court recognized that granting the wife a cause of action for loss of consortium may result in a double recovery for the same injury if, for example, the husband sought recovery in an action for his diminished ability to support his family. *Id.* at 426. It responded with language that would be cited for decades to come: "This argument emphasizes only one element of consortium—the loss of support. Consortium, however, includes, *in addition to material services*, elements of companionship, felicity[,] and sexual intercourse, all welded into a conceptualistic unity." (Emphasis added.) *Id.* at 427. It continued that any conceivable double recovery for the loss of support can be obviated by deducting from the computation of damages in the consortium action any compensation for the loss of support in the other action. *Id.*

¶ 40     The *Dini* court also recognized the concern of its opponents that, while an action for loss of consortium is grounded in the husband's historic right to the services of his wife, wives have not, historically, had a corresponding right to the services of their husbands. *Id.* at 427-28. It responded that, if the wife's action was to be historically grounded in sentimental services only, then so be it—other causes of action, such as alienation of affection, also allow damages for sentimental services. *Id.* at 428. It continued, in another oft-cited proposition, that the contrary position "gratuitously assumes that the concept of consortium *is capable of dismemberment* into

16

material services and sentimental services—which is but a theoretician's boast." (Emphasis added.) *Id.* at 427-28.

¶ 41    Numerous courts have relied on *Dini*'s language that a common law action for loss of consortium includes the loss of material services. See, *e.g.*, *Blagg v. Illinois F.W.D. Truck & Equipment Co.*, 143 Ill. 2d 188, 195 (1991) (citing *Dini*'s language without discussion or direct application); *Manders v. Pulice*, 102 Ill. App. 2d 468, 472 (1968). However, this language has problematic underpinnings. As recognized by the court in *Pfeifer*, the *Dini* court was not asked to decide whether the loss of financial support or material services were components of consortium. *Pfeifer*, 253 Ill. App. 3d at 1030-31. As the *Pfeifer* court held and as both parties accept in the instant case, the loss of financial support falls squarely outside a consortium claim. *Id.* at 1031. The loss of financial support is not an amorphous, highly individualized claim but a tangible and ascertainable pecuniary damage classically sought in a wrongful-death suit. *Id.* at 1030. The problem with the *Dini* quote is that, in placing the arguably more personalized "material services" within the consortium claim, it equated the loss of material services with the loss of financial support—a loss which both parties agree is not a component of the consortium damages.

¶ 42    In addition, numerous courts have relied upon *Dini*'s language that the concept of consortium is not capable of dismemberment into its material and sentimental components. See, *e.g.*, *Dotson II*, 199 Ill. App. 3d at 529. The *Dini* dissent observed certain inconsistencies in the majority's position, including that, on the one hand, the majority discounted the risk of double recovery by noting that a court could deduct from the consortium claim damages for components of consortium that had already been accounted for in other causes of action and, on the other hand, cautioned that the components of consortium could not be separated. *Dini*, 20 Ill. 2d at 434 (Schaefer, C.J., dissenting). It would seem to us that, by saying that it is impossible to separate the

elements of a loss of consortium claim, we are also saying something about those elements—that they are amorphous. In contrast, the lost services that have classically been pursued in statutory wrongful death actions—mending clothes, tending livestock—appear to us to be rather concrete, and, as the trial court found, are amenable to economic valuation in a manner that the highly personalized elements of consortium are not.

¶ 43                                    3. The Inclusion of Consortium Damages

Within a Statutory Wrongful Death Action: *Elliott*

¶ 44        We now turn to *Elliott*, where our supreme court held that a plaintiff was permitted to seek damages for loss of consortium within a statutory wrongful death action and, in so doing, brought about changes to the wrongful-death IPI instructions. *Elliott*, 92 Ill. 2d at 540-41. In *Elliott*, the plaintiff brought a statutory wrongful death action after her husband was killed in a car accident. *Id.* at 533. During the jury instruction conference, the defendants proposed a modified version of Illinois Pattern Jury Instructions, Civil, No. 31.07 (2d ed. 1971) (hereinafter IPI Civil 2d No. 31.07), which read: "In determining pecuniary injuries, you may *not* consider *** the loss of [the] decedent's society by the widow and next of kin." (Emphasis in original and internal quotation marks omitted.) *Elliott*, 92 Ill. 2d at 533. The trial court gave the instruction over the plaintiff's objection. *Id.* The jury awarded $4500 in relation to the wrongful death action, which was the stipulated value of the husband's car. *Id.* The plaintiff appealed, arguing, *inter alia*, that the trial court erred in refusing to instruct the jury on the plaintiff's loss of consortium. *Id.* at 534.

¶ 45        The supreme court agreed. *Id.* at 540-41. Because its holding represents a critical turning point in the case law, and because our reading of *Elliott* differs from that of the *Dotson* courts', we quote extended portions of the *Elliott* analysis:

18

"[T]he question with which we are faced is whether loss of consortium is compensable as a 'pecuniary injur[y]' under the Wrongful Death Act.

[Plaintiff] and defendants agree that consortium is unique to a marriage partner [citation]. It includes society, guidance, companionship, felicity, and sexual relations. [Citations.]

*Hall v. Gillins* [13 Ill. 2d 26 (1958)] and *Knierim v. Izzo* [22 Ill. 2d 73 (1961)], where this court previously examined common law actions brought to recover for loss involving destruction of the family unit, are particularly helpful. The court reasoned in both of those decisions that since the remedy sought in each case was not significantly different from the statutory remedy available under the Wrongful Death Act, which allows compensation for 'pecuniary injuries,' *a common law action in tort would not be recognized*." (Emphasis added.) *Id.* at 534-35.

Further,

"In *Knierim*[, 22 Ill. 2d at 82-83], the court relied upon *Hall* in finding 'that the differences between an action for loss of consortium resulting from the death of a husband and an action for pecuniary loss under the Wrongful Death Act are *not sufficiently significant to warrant us recognizing the action for loss of consortium as an additional remedy* available to the widow.'

In addressing the loss of consortium issue in *Knierim* the court reiterated our words in *Hall* that '*** [t]he term "pecuniary injuries" has received an interpretation that is broad enough to include most of the items of damage that are claimed by the plaintiffs in this case.' [Citation.] While neither *Knierim* nor *Hall* explicitly held that loss of consortium was to be considered by the jury in deciding what the appropriate amount of damages was,

it is apparent that *the court denied the common law counts in both actions* because the remedy available in the preemptive wrongful death statute allowed compensation for the injuries alleged." (Emphases added and internal quotation marks omitted.) *Id.* at 536. Finally,

"It is true that damages for loss of consortium are not capable of being given the detailed in-depth analysis that an expert can be called upon to testify about in calculating a decedent's professional worth where future earnings of an individual employed in a particular field can be measured with precision and particularity. Just the same the damages for loss of a husband's society, companionship and sexual relations are not immeasurable. All of the elements that comprise what is considered to be loss of consortium may not be the most tangible items, but a jury is capable of putting a monetary worth on them. *Therefore, to be consistent with the broad interpretation of 'pecuniary injuries' under the Wrongful Death Act [citation] we find loss of consortium to be included.*

The purpose of the Wrongful Death Act is to compensate the surviving spouse and next of kin or the pecuniary losses sustained due to the decedent's death. [Citations.] It is intended to provide the surviving spouse the benefits that would have been received from the continued life of the decedent. The jury should have been instructed that the value of the decedent's companionship and conjugal relations could be considered in computing the damages to be recovered." (Emphasis added.) *Id.* at 539-40.

¶ 46 The *Elliott* court then specifically addressed the changes that should be made to the standard IPI instructions applicable in statutory wrongful death actions:

"In view of our holding it is clear that the jury was not properly instructed on the measure of damages. The language of IPI Civil [(2d)] No. 31.07 that indicates that in

20

determining 'pecuniary injuries' the jury may not consider '[t]he loss of decedent's society by the widow and next of kin' is no longer valid. In determining the pecuniary value of a spouse under IPI Civil [(2d)] No. 31.04 the society, companionship and conjugal relationship that constitute loss of consortium are factors that the jury may consider." *Id.* at 541.

¶ 47                            4. Post-*Elliott*: Appellate Decisions

¶ 48       Since *Elliott*, four appellate court decisions have addressed challenges arising from the inclusion of consortium damages within a statutory wrongful death claim. These are *Carter*, *Dotson I*, *Dotson II*, and *Pfeifer*.

¶ 49                                    a. *Carter*

¶ 50       In *Carter*, the appellate court affirmed the manner in which the trial court handled the plaintiff's remarriage when the plaintiff sought consortium damages within his statutory wrongful death action. *Carter*, 130 Ill. App. 3d at 435. The trial court had given the plaintiff two options. *Id.* Under the first option, the plaintiff would be permitted to seek damages for loss of consortium but he would also be required to inform the jury of his remarriage. *Id.* The jury would receive instructions that the loss of consortium damages would be calculated only to the date of remarriage but that remarriage would not affect any other element of damages or liability. *Id.* Under the second option, the plaintiff could withhold the fact of his remarriage from the jury, but he would not be permitted to seek damages for loss of consortium. *Id.* The plaintiff elected the second option and, in choosing "not to include loss of consortium as an element of damage[,] [he] thus insured that the fact of his remarriage would not be brought to the attention of the jury." *Id.*

¶ 51       The plaintiff appealed, arguing that, under *Watson* and *Elliott*, the trial court should have permitted him to seek damages for loss of consortium and instruct the jury that his remarriage was

21

irrelevant to the determination of damages. *Id.* at 436. The plaintiff correctly noted that, per *Watson*, remarriage was irrelevant to a determination of damages in a wrongful death suit. *Id.* The plaintiff then appeared to argue that, because *Elliott* did not purport to limit *Watson*, then, when *Elliott* allowed damages for loss of consortium to be brought within a wrongful death suit, those consortium damages were subject to the same rules as other damage elements of the wrongful death suit—*i.e.*, they were not subject to limitation based on remarriage—and were no longer subject to the rule governing common law action for loss of consortium that damages be calculated only to the date of remarriage. *Id.*

¶ 52    The appellate court disagreed. *Id.* In a brief analysis, it noted that when, as in *Elliott*, the supreme court announces a new principle of law, it overrules, *sub silentio*, all prior conflicting authority. *Id.* The appellate court continued that, as to the damage element of consortium only, a plaintiff's remarriage will affect the jury's determination of damages within the wrongful death claim. *Id.* The appellate court rejected the plaintiff's argument that, because consortium with the deceased spouse may have been of a different quality from that with the present spouse, a different result was warranted. *Id.* Thus, it concluded, the trial court's decision to give the plaintiff two options—seek consortium damages but disclose the circumstance of remarriage to the jury, or forgo consortium damages and keep the circumstance of remarriage from the jury—was "sensible and logical." *Id.*

¶ 53                                        b. *Dotson I*

¶ 54    In *Dotson I*, the appellate court interpreted *Elliott* as mandating that material services are now recoverable in wrongful death actions *only* as part of a loss of consortium claim. *Dotson I*, 157 Ill. App. 3d at 1044. In *Dotson I*, the plaintiff's wife was killed by an explosion following a repair to a clothes dryer performed by the defendant's employee. *Id.* at 1039. The plaintiff brought

22

a statutory wrongful death action. *Id.* at 1040. He wished to keep the fact of his remarriage from the jury, so he withdrew his request for consortium damages. *Id.* at 1043. Nevertheless, the trial court allowed the plaintiff to testify to the quality of his marriage to the decedent for the purpose of showing what material services were lost. *Id.* The jury awarded $1.7 million in the wrongful death suit. *Id.* at 1040. The defendant appealed, arguing that the trial court erred in allowing the plaintiff to testify to the quality of his marriage; the testimony was ostensibly offered to show proof of the decedent's material services but was in reality offered to show a loss of society. *Id.* at 1043.

¶ 55    The *Dotson I* court agreed with the defendant, and it went a step further. *Id.* It wrote:

"[E]ven if the quality of [plaintiff's marriage to decedent] was relevant to the claim for loss of [the decedent's] material services, such evidence was precluded by [plaintiff's] withdrawal of his loss of consortium claim. Contrary to the understanding of the trial court, a loss of consortium claim includes a claim for loss of material services." *Id.*

¶ 56    To explain its ruling, the *Dotson I* court recounted the developing law: (1) claims for a spouse's services in the home have traditionally been recoverable in wrongful death actions (*McFarlane*); (2) evidence of remarriage was irrelevant to a determination of damages in wrongful death actions (*Watson*); (3) *Elliott* allowed plaintiffs to seek damages for loss of consortium within wrongful death actions (*Elliott*);  and (4) *Carter* held that *Elliott* implicitly overruled *Watson* in part, in that, moving forward, the circumstance of remarriage was relevant to a determination of damages for loss of consortium within a wrongful death action. *Id.* at 1043-44.

¶ 57    From this, the *Dotson I* court inferred:

"Although neither *Elliott* nor *Carter* explicitly hold that a claim for loss of a spouse's material services is henceforth incorporated into the now recoverable claim for loss of consortium in a wrongful death action, they must be construed to such effect. While

23

*Elliott* did not mention the material services component of the loss of consortium claim, it affirmed an appellate court decision which held that the trial court should have given the jury an instruction on loss of consortium, '*i.e.*, *lost services*, society, companionship and sex.' (Emphasis added.) (*Elliott v. Willis*[, 89 Ill. App. 3d 1144, 1145 (1980)].) Moreover, the supreme court noted that consortium 'includes society, guidance, companionship, felicity and sexual relations. (*Elliott*[, 92 Ill. 2d [at] 535], citing *Dini*[, 20 Ill. 2d 406].) That case, in turn, observed that consortium includes 'in addition to *material services*, \*\*\* companionship, felicity and sexual intercourse, all welded into a conceptualistic unity' and that consortium was incapable of separation into the 'material and sentimental services.' (Emphasis added.) [*Dini*, 20 Ill. 2d at 427-28].

From these cases, we conclude that material services have always been a component of a claim for loss of consortium and that the allowance of their recovery in wrongful death actions prior to *Elliott* was a necessary departure from this general rule. We further conclude that *Elliott mandates a finding that material services are now recoverable in wrongful death actions only as part of a loss of consortium claim*. As such, the trial court erred when it allowed evidence of the quality of the [plaintiff's] marriage as evidence that [the decedent's] services to [the plaintiff] would have continued in the future. Because [the plaintiff] withdrew his claim for loss of consortium, which under *Elliott* included his claim for loss of material services, this evidence was irrelevant to the issue of the amount of damages to which [the plaintiff] was entitled. This error requires a reversal of the $1,700,000 award to the estate of [the decedent] and a new trial." (Emphases added and in original.) *Id.* at 1044.

24

¶ 58    The *Dotson I* court added: "Having concluded that [the plaintiff] could not separate a claim for loss of material services from a claim for loss of consortium, we also conclude that to the extent the trial court allowed [the plaintiff] to advance a claim for such services it should have allowed evidence of his remarriage." *Id.* at 1045.

¶ 59                                    c. *Dotson II*

¶ 60    The *Dotson II* court addressed the plaintiff's appeal from the second trial. This time, the plaintiff argued that the trial court erred in instructing the jury to limit damages for lost material services to the loss sustained from the time of decedent's death to the time of the plaintiff's remarriage. *Dotson II*, 199 Ill. App. 3d at 527. The appellate court held that the determination that material services were recoverable only as part of a loss of consortium claim was law of the case. *Id.* at 528. Further, the *Dotson II* court defended the *Dotson I* rationale by noting that (1) historically, the common law recognized a loss of consortium action in the husband for the loss of his wife's services; (2) the *Dini* court held that material services were an element of loss of consortium; and (3) the *Dini* court also held that the elements of consortium are welded into an inseparable, conceptualistic unity. *Id.* at 529-31. Because of this, the court concluded, "after *Elliott*[,] remarriage limits a claim for material services as much as it limits any other element of consortium." *Id.* at 531.

¶ 61    Though *Dotson II* may have initially appeared to retreat from *Dotson I* when it referred to its earlier holding as the law of the case (*id.* at 528), it later went one step further than its initial determination that a plaintiff could pursue a claim for material services so long as he disclosed the fact of his remarriage (*Dotson I*, 157 Ill. App. 3d at 1045). *Dotson II* ultimately concluded that a plaintiff would be precluded from seeking damages for the loss of material services beyond the date of remarriage. *Dotson II*, 199 Ill. App. 3d at 531.

25

d. *Pfeifer*

In *Pfeifer*, the trial court limited damages to the date of remarriage for the loss of the decedent spouse's financial support within a wrongful death action. 253 Ill. App. 3d at 1026. The appellate court reversed, explaining that *Watson* controlled over *Dotson I* and *Dotson II*. *Id.* at 1026-31. In particular, the appellate court stressed that the loss of financial support and the loss of consortium are distinct and independent components of the pecuniary damages recoverable under the Wrongful Death Act. *Id.* at 1031. *Watson* had held that remarriage does not affect damages recoverable in a wrongful death action, and this applies equally to the loss of financial support. *Id.* at 1027. Further, the defendant "cannot escape application of the [*Watson*] rule by attempting to recast financial support as either a type of material service or as an element of loss of consortium separate from but similar to the 'material services' which were at issue in *Dotson*." *Id.* at 1027-28.

The *Pfeifer* court recognized the language in *Dini* placing material services in the consortium basket and appearing to equate material services with loss of financial support. *Id.* at 1030-31 (" '[t]his argument emphasizes only one element of consortium—the loss of support' " (quoting *Dini*, 20 Ill. 2d at 427)). The *Pfeifer* court reasoned, however, that the above-quoted comment appeared in a *dicta* portion of the *Dini* decision, the main point of which had been merely to establish that a wife's claim to loss of consortium is equal to that of a husband's. *Id.* at 1031. The *Pfeifer* court concluded that, if the *Dini* court had been squarely faced with the question of whether financial support was an element of consortium, it would not have made the comment. *Id.* at 1031.

In support of its holding, the *Pfeifer* court synthesized the case law pertaining to the definitions of consortium and material services within a consortium claim. *Id.* at 1029-30. It contrasted consortium and material services within a consortium claim with financial support:

"[T]he *Dotson* court, which held that material services were a component of a claim for loss of consortium, perceived such services as unique to a marital relationship ***.

The concept of consortium, as it emerges from the cases, *consists primarily and essentially of intangible elements which are unique, and very personal, to any given marriage*. The loss of consortium reflects the loss of personal benefits and satisfactions the surviving spouse enjoyed as a result of a highly individualized relationship with a particular person. That relationship and those benefits cannot be duplicated. As for material services, we note first that the courts speak of a wife's 'services in the home,' services 'as [the spouse's] wife,' and 'personal services.' The courts' discussions do not include, even by implication, the concept of financial support. Too, while some material services are clearly more tangible in nature than such things as affection and companionship, they are also highly personal to, and generally flow from, the particular relationship between specific spouses. As such, they are properly part of consortium.

In contrast, financial support lost due to the wrongful death of a spouse is totally tangible. Financial support is wholly unlike the elusive and highly personal characteristics of consortium. It does not flow from, is not unique to, and does not depend upon the relationship between particular spouses." (Emphasis added.) *Id.*

¶ 66    The *Pfeifer* court readily distinguished the damages at issue in the case before it—lost financial support—with those at issue in *Dotson I* and *Dotson II*—lost material services. Unlike us, they were not called upon to agree or disagree with the inferences made by the *Dotson* courts. Nevertheless, we agree with *Pfeifer* that *Watson* continues to be good law and the general rule in statutory wrongful death actions. With the exception of damages for loss of consortium within a wrongful death action, a plaintiff's remarriage may not affect a jury's determination of damages

27

in a wrongful death action. We also take away that the concept of consortium "consists primarily and essentially of intangible elements which are unique, and very personal, to any given marriage." *Id.* at 1029.

¶ 67                                    B. Application to the Instant Case

¶ 68            The aforementioned cases demonstrate that financial support and material services have, historically, been recoverable under a statutory wrongful death action. On a parallel track, common law has, historically, recognized a cause of action for loss of consortium, which also has been said to include material services. The supreme court in *Elliott* allowed for a plaintiff to seek damages for loss of consortium within a statutory wrongful death action. However, as *Elliott* was not a remarriage case, it did not instruct upon the consequences of remarriage to a jury's determination of damages when a plaintiff chooses to seek damages for loss of consortium (in which remarriage is a guiding consideration) within a statutory wrongful death action (in which remarriage may not be considered).

¶ 69            For the reasons that follow, we determine that, when a plaintiff chooses to seek damages for loss of consortium within a statutory wrongful death action, the classic elements of a statutory wrongful death action—loss of financial support and loss of material services—are preserved and remain subject to the supreme court's holding that remarriage must not affect the jury's determination of damages. See *Watson*, 54 Ill. 2d at 500. The remaining elements of a loss of consortium claim, including "society, guidance, companionship, felicity and sexual relations," remain subject to the *Carter* rule of termination upon remarriage. See *Elliott*, 92 Ill. 2d 535 (describing consortium); see also *Carter*, 130 Ill. App. 3d at 436 (the remarriage rule as applied to damages for loss of consortium).

28

¶ 70　　As stated in *Pfeifer*, the concept of consortium "consists primarily and essentially of intangible elements which are unique, and very personal, to any given marriage." *Pfeifer*, 253 Ill. App. 3d at 1030. *Elliott* named these elements as "society, guidance, companionship, felicity and sexual relations," and "society, companionship[,] and [the] conjugal relationship." *Elliott*, 92 Ill. 2d at 535, 541. These core components of consortium are what had not been recoverable in statutory wrongful death actions prior to *Elliott*, and, with their addition, the common law action for loss of consortium was no longer necessary as a separate cause of action in the same suit.

¶ 71　　The parties focus on the fact that, in instruction No. 32 (IPI Civil No. 45.01B), plaintiff placed lost earnings and lost household services on the same line and Jurak did not object. Equally important, however, is that IPI Civil No. 31.04 places the loss of services and the loss of the marital relationship on separate lines, a formulation that followed from the supreme court's analysis in *Elliott*. *Elliott*, 92 Ill. 2d at 541. Thus, *Elliott* offers additional support for our holding in that services, a traditional element of a statutory wrongful death action, are distinct from the remaining elements of consortium. This defeats a critical premise in the *Dotson* decisions.

¶ 72　　The *Dotson* decisions hang on the support-and-material-services language in *Dini*, which, as *Pfeifer* noted, was set forth in *dicta*, and on the idea that the consortium is a conceptualistic unity which cannot ever be broken into its various components. However, as noted, the support-and-material-services language in *Dini* has problematic underpinnings. Moreover, the conceptualistic-unity language in *Dini* was not iron clad.

¶ 73　　To the contrary, the *Dini* court forecast that, when brought in conjunction with another cause of action, a trial court may need to deduct damages from the otherwise unbreakable conceptualistic unity of consortium to avoid double recovery. *Dini*, 20 Ill. 2d at 427. Here, plaintiff has not brought a consortium action in addition to a wrongful death action, but he seeks damages

29

for consortium within a wrongful death action. As *Elliott* instructs, if one cause of action versus the other—a statutory wrongful death action versus a common law loss of consortium—must bend from its historical pure form, it is the common law loss of consortium action. This must be the case where, as here, the plaintiff filed a statutory wrongful death action, not a common law loss of consortium action. In fact, in *Elliott*, the supreme court favorably recounted that, when the plaintiff in *Knierim* chose to pursue pecuniary losses under the Wrongful Death Act, the common law action for loss of consortium "would not be recognized." *Elliott*, 92 Ill. 2d at 535-36.

¶ 74 Indeed, the *Dotson* courts' logic that, because the elements of consortium exist in an unbreakable unity, a plaintiff in a statutory wrongful death suit can only seek damages for loss of material services as part of a loss of consortium claim, would make more sense conceptually if *Elliott* had held that the statutory wrongful death action would be subsumed within a consortium claim, not the other way around.

¶ 75 Thus, we decline to follow the *Dotson* decisions for at least two reasons: (1) *Dotson* interprets *Elliott* to have limited the relief available under the Wrongful Death Act, when, in our view, *Elliott* (which was not a remarriage case) intended to expand the relief available under the Wrongful Death Act while eliminating the need for a separate, common law loss of consortium action; (2) *Dotson* potentially eliminates, or at least changes the character of, previously available relief for one class of litigants (a plaintiff spouse in a wrongful death action) but not for another class of litigants (a plaintiff lineal next-of-kin in a wrongful death action). For example, under *Dotson*, a plaintiff spouse cannot seek damages for lost material services outside his request for consortium damages. In attempting to prove or describe the lost material services, the plaintiff spouse would be relegated to highly personal, non-market valuations of the same. See *Elliott*, 92 Ill. 2d at 540. However, a plaintiff child or parent would be able to seek damages for lost material

30

services and submit market-value evidence of the same. Similarly, a plaintiff spouse who does not wish to pursue damages for loss of the marital relationship, and in exchange keep his remarriage from the jury, cannot seek damages for lost material services, even though lost material services have always been recoverable under a statutory wrongful death action. However, a plaintiff child or parent, for whom loss of the marital relationship is inapplicable, could seek damages for lost material services. In this way, material services are not unique to the marital relationship. *Cf. Mitchell*, 58 Ill. 2d at 162 (consortium is unique to the marriage partner).

¶ 76    Our holding is consistent with *Williams v. BNSF Ry. Co.*, 2015 IL App (1st) 121901-B, ¶ 49. *Williams* provides guidance in that it, too, examines a plaintiff's ability to recover consortium damages within a statutory cause of action—there, the Federal Employers' Liability Act (FELA) (45 U.S.C. § 51 (2006)). *Williams* instructs that a plaintiff in a FELA action may not recover consortium damages but may recover for lost household services, the latter having "nothing to do with [the plaintiff's] relationship with his wife and the effect [the plaintiff's] injuries had on that relationship." *Williams*, 2015 IL App (1st) 121901-B, ¶ 49. Thus, *Williams* did not agree with the *Dotson* rationale that a claim of damages for lost material services was an indivisible part of a claim for loss of consortium such that, if damages for loss of consortium were not sought or could not be sought, neither could damages for lost material services.

¶ 77    In sum, we reject Jurak's argument that damages for loss of material services must end upon remarriage. Aside from the *Dotson* cases, which are problematic for the reasons stated, Jurak relies primarily on case law concerning the common law action for loss of consortium. See, *e.g.*, *Blagg*, 143 Ill. 2d at 195; *Dini*, 20 Ill. 2d 406; *Manders*, 102 Ill. App. 2d 468. The instant plaintiff did not file a common law action for loss of consortium. He filed a statutory cause of action for wrongful death. The case law addressing that cause of action—primarily *Watson* and *Elliott*, both

supreme court cases—control. Because we have held that the trial court properly allowed plaintiff to recover for loss of material services independent of his recovery for loss of consortium, *i.e.*, loss of the marital relationship, we need not address Jurak's argument that, as a part of the consortium, material services share the same elusive traits as other consortium elements that render expert, market valuation inappropriate.

¶ 78       As a final matter, to the extent that Jurak continues to argue that Smith's testimony concerning household services was improper even outside the consortium context, we disagree. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Ill. R. Evid. 702 (eff. Jan. 1, 2011). To be admissible, expert testimony must be supported by an adequate foundation, showing that the facts or data relied upon by the expert are of a type relied upon by experts in the relevant field. Ill. R. Evid. 703 (eff. Jan. 1, 2011); *Wilson v. Clark*, 84 Ill. 2d 186, 193-96 (1981). In this case, as the trial court stated: "[Smith's] opinions were in part based on objective information and statistics all properly disclosed in discovery. His testimony was subjected to vigorous cross-examination and the jury was free to accept or reject such testimony. Defendant could have offered expert testimony to rebut Dr. Smith but chose not to." There is no error here.

¶ 79                                    III. CONCLUSION

¶ 80       The judgment of the circuit court of Grundy County is affirmed.

¶ 81       Affirmed.

32

*Passafiume v. Jurak*, 2023 IL App (3d) 220232

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Grundy County, No. 17-L-7; the Hon. Lance R. Peterson, Judge, presiding. |
| **Attorneys for Appellant:** | Troy A. Lundquist and Stacy K. Shelly, of Langhenry, Gillen, Lundquist & Johnson, LLC, of Joliet, and Melinda S. Kollross, of Clausen Miller P.C., of Chicago, for appellants. |
| **Attorneys for Appellee:** | Robert J. Napleton and David J. Gallagher, of Motherway & Napleton, LLP, of Chicago, and Lynn D. Dowd and Jennifer L. Barron, of Law Offices of Lynn D. Dowd, of Naperville, for appellee. |